## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JEMAL A. CHEATHAM,

      Plaintiff,

  v.

ALEJANDRO MAYORKAS, *et al*.,

      Defendants.

Civil Action No. 18-03026 (CKK)

## <u>MEMORANDUM OPINION</u>

      Plaintiff, Jemal A. Cheatham, appearing *pro se* and *in forma pauperis*, sues the Secretary of the United States Department of Homeland Security ("DHS")[1] and 23 unidentified John/Jane Does.[2]  *See* Amended Complaint ("Am. Compl."), ECF No. 25, at 1, 3, 12.   Before the Court is Defendants' Motion to Dismiss and/or for Summary Judgment, ECF No. 35, Memorandum in Support ("Defs.' Mem."), ECF No. 35-1, and Statement of Material Facts ("Defs.' Stmt."), ECF No. 35-2. For reasons explained herein, the Court will grant the Motion, dismissing without prejudice Counts II, III, IV, and V, pursuant to the Federal Rule 12(b)(1), and entering summary judgment as to Count I and any other intended claims arising from violations of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-16, arising from Cheatham's sex and gender.

---

[1]    The current DHS Secretary is automatically substituted in his official capacity for his predecessor pursuant to Fed. R. Civ. P. 25(d).

[2]    As previously noted in the Court's previous Memorandum Opinion ("Mem. Op."), ECF No. 18, at 6, the head of the agency is the only proper defendant in a Title VII action, *see* 42 U.S.C. § 2000e–16(c); *Davis v. Califano*, 613 F.2d 957, 958 n.1 (D.C. Cir. 1980).  Additionally, the Local Rules of this Court state that a plaintiff "filing *pro se in forma pauperis* must provide in the [complaint's] caption the name and full residence address or official address of each party." LCvR 5.1(c)(1).  For these reasons, the claims against all "Doe Defendants" will be dismissed.

# I.     PROCEDURAL HISTORY

Cheatham filed this matter on December 3, 2018.  Defendants responded to the original Complaint by filing a preliminary Motion to Dismiss pursuant to Federal Rules 4(m), 8(a), 12(b)(1), and 12(b)(6).  *See* First Motion to Dismiss, ECF No. 11. On March 4, 2020, the Court denied the Motion without prejudice.  *See generally* Mem. Op.; Order, ECF No. 19.  Among other conclusions, the Court found that the Complaint failed to comply with Federal Rule 8(a), but that Cheatham's intended Title VII discrimination and retaliation claims materialized with slightly more precision during motions briefing.  *See* Mem. Op. at 11.  Therefore, Cheatham was directed, pursuant to Federal Rule 15(a)(2), to amend his complaint by April 6, 2020, and to assert his claims with "greater clarity." *Id.* (citing *Carter v. Dep't of the Navy*, No. 05–cv–0775, 2006 WL 2471520 at *4 (D.D.C. Aug. 24, 2006)).

On March 27, 2020, Cheatham filed a Motion for Extension, ECF No. 20, to file an amended complaint, which the Court granted by Minute Order on April 10, 2020.  Cheatham was ordered to file an amended complaint by May 8, 2020.  *Id.*  By September 1, 2020, the Court had not yet received an amended complaint, and consequently, Cheatham was ordered to show cause why this case should not be dismissed for failure to prosecute.  *See* Show Cause Order, ECF No. 23.  Cheatham then filed a timely Response that included evidence that an Amended Complaint, attached as an exhibit thereto, had been timely received by the courthouse mailroom, but for unknown reasons, had not been docketed.  As a result, on October 30, 2020, the Court entered a minute order discharging the Show Cause Order and directed the Clerk to docket the attached Amended Complaint.

Cheatham contends that DHS, more specifically, his former employer and DHS subsidiary, the Federal Emergency Management Agency ("FEMA"), discriminated against him based on his

male sex and gender.  *See* Am. Compl. ¶¶ 1, 8, 17, 21, 35.  He sues Defendants for discriminatory termination based on his sex and gender in violation of Title VII, *id.* ¶¶ 32–6, and for retaliation in violation of 42 U.S. Code § 1981 ("Section 1981"), *id.* ¶¶ 37–61.  Cheatham seeks declaratory and injunctive relief, *id.* ¶¶ 62–65, reinstatement, back pay, compensatory damages, punitive damages, liquidated damages, and fees and costs, *id.* at Prayer for Relief.

After a brief extension, on December 2, 2020, Defendants filed the pending Motion to Dismiss and/or for Summary Judgment, to which Cheatham filed an Opposition ("Opp'n") and Statement of Material Facts ("Pl.'s Stmt."), collectively ECF No. 37.  Defendants then filed a Reply ("Reply"), ECF No. 38.  The Motion is now ripe for the Court's consideration.

## II.    FACTUAL BACKGROUND

On September 11, 2011, Cheatham began working at FEMA as an accountant for the Internal Control Team in the Office of the Chief Financial Officer.  Am. Compl. ¶ 10, 16–17; Pl.'s Stmt. ¶ 1 (citing Report of Investigation ("ROI") (also attached at Defs.' Ex. 2, ECF No. 35-4) at 1, 72); Defs.' Stmt. ¶ 1; Defs.' Ex. 1, ECF No. 35-3, at 183, 187.  His employment was subject to a one-year probationary period.  *See* Am. Compl. ¶¶ 3, 22; Defs.' Stmt. ¶ 2; Defs.' Ex. 1 at 183, 263, 288–89; Defs.' Ex. 2 at 5; Defs.' Ex. 3, ECF No. 35-5, at 2.  Cheatham worked, for a period of time and in certain capacities, "under the direction of a male Team Lead employee," Michael Walker.  Am. Compl. ¶ 17.  On March 20, 2012, Cheatham emailed Responsible Management Official, Kathy Hill – also the Director of Risk Management and Cheatham's direct supervisor, Pl.'s Stmt. ¶ 4 – wanting to discuss "high level issues" relating to Walker, Defs.' Ex. 1 at 213–15.  Hill replied suggesting that they discuss the issues the following day.  *See id.* at 215.

The following month, on June 4, 2012, Hill met with Walker to discuss complaints regarding alleged improprieties in Cheatham's interactions with some of his female co-workers.

Defs.' Ex. 3 at 6 (citing ROI 110).   At the meeting, Walker informed Hill that Cheatham had allegedly

> 1. Looked at a waitress in an Atlanta restaurant in December 2011
> while having lunch;
> 2. Sexually harassed an intern on her first day working . . . [and]
> 3. There was a possible situation involving AFC (i.e. Chapman)
> that he declined to go into detail.

*Id.* (quoting ROI 126, 195).

More specifically, Walker reported that the first incident ("First Allegation") occurred during a training in Atlanta.  *Id.* at 6–7 (citing Administrative Judge ("AJ") Ex. 5 at 443, 543, 733). Cheatham was accompanied by two female co-workers at a lunch outing, during which, Cheatham allegedly inappropriately stared at a waitress.  *Id.*  According to Walker, he and two female co-workers had to tell Cheatham that his staring was inappropriate.  *Id.* at 7 (citing AJ Ex. 5 at 734).

As to the second incident ("Second Allegation"), Walker reported that a female intern, Sandra Akintola, alleged that Cheatham "rubbed her arm and made her feel uncomfortable."  *Id.* (quoting ROI 108).  Hill then followed up with Akintola, who did not, at first, confirm that anything happened but asked to be moved away from Cheatham.  *Id*.  Consequently, Hill removed Akintola from the project on which she had been working with Cheatham.  *Id*. (citing ROI 108; AJ Ex. 5 at 442).  The third allegation ("Third Allegation") was a "possible situation" with another female co-worker, Amanda Fenwick-Chapman, that seemed to be emerging.  *See id.* (quoting ROI 126, 195).

At the time, Cheatham had some level of knowledge about the three Allegations, and he believed them to be a complete fabrication by Walker, created solely to attack and humiliate him. *See id.* (citing ROI 110; 193); *see also* Pl's Ex. 4, ECF No. 34-4, at 141–43; Defs.' Ex. 1 at 105– 08.  On the day following the Walker/Hill meeting, June 5, 2012, Cheatham reached out to Hill

requesting his own meeting. *See id.*  In these email communications, Plaintiff expressed his concern about Walker's alleged fabrications and workplace discourse regarding same, and also noted that he felt sexually harassed by Walker, who had allegedly asked Cheatham repeatedly about Cheatham's "sexual exploits." *See* Pl.'s Ex. 4, ECF No. 37–4, at 143; *see also* Am. Compl. ¶ 18; Pl.'s Stmt. ¶¶ 5–6 (citing Walker Deposition at 12–13), 13.  Cheatham alleged that Walker was preoccupied with Cheatham's status as a single man. *See id.*  He alleges that neither Hill, nor any other "higher level officials[,]" took any action to remedy the situation with Walker.  Am. Compl. ¶ 19; *see also* Pl.'s Stmt. ¶¶ 14–15 (citing ROI 00081, 00166). Cheatham also states that he requested to be fully transferred to another work group and that such request was denied.  Pl.'s Stmt. ¶ 23.

On the other hand, Defendants contend, and the record shows, that the agency did, in fact, take action, even if not quite as swiftly or in the manner Cheatham would have initially preferred. *See* Defs.' Stmt. ¶ 4.  By June 11, 2012 – within four business days of Cheatham's request for a meeting – Hill met with Cheatham and Walker to jointly discuss Cheatham's reported issues[3] and to attempt to resolve same.  *See* Defs.' Stmt. ¶ 4 (citing Defs.' Ex. 1 at 108).

On June 13, 2012, two days after the meeting with Hill, Cheatham filed an informal Equal Employment Opportunity ("EEO") sexual harassment Complaint Against Walker ("Complaint Against Walker") for posing "personal and searching questions" about Cheatham's sex life. *Id.*  ¶ 5 (citing Defs.' Ex. 1 at 97); Defs.' Ex. 3 at 7 (quoting ROI 101); Pl.'s Stmt. ¶ 21.  The Complaint Against Walker also alleged that Hill failed to resolve the issues despite her knowledge that Walker

---

[3]     On June 8, 2012, Cheatham declined Walker's physical activity program calendar invitation to go swimming at a gym during off-work hours, which Cheatham perceived to be sexual harassment.  Pl.'s Stmt. ¶¶ 13, 16 (citing ROI 00168); *see* Defs.' Ex. 1 at 98–9, 272.  There is nothing in the record to suggest that Cheatham reported this incident until after his termination. *See* Defs.' Ex. 1 at 8, 108.

made Cheatham "very uncomfortable." Defs.' Ex. 3 at 7 (quoting ROI 101). Cheatham also reiterated that the First, Second, and Third Allegations were concocted by Walker as a ruse to oust him from employment during his probationary period. *See id*.

On the same date, June 13, 2012, Hill independently determined that Cheatham would henceforth report only to her, and not to Walker. *See* Defs.' Stmt. ¶ 4 (citing Defs.' Ex. 1 at 108); *see also* Defs.' Ex. 3 at 7–8.

On June 22, 2012, Stacy L. Merriwether, an EEO specialist with FEMA's Office of Equal Rights, was assigned as the counselor for the pre-complaint phase of the Complaint Against Walker. Pl.'s Stmt. ¶ 22 (citing ROI 00106); Defs.' Ex. 1 at 143. Merriwether promptly reached out to Cheatham, *see id*., and then began the pre-complaint process by also notifying Walker of the charges against him, compiling information, and initiating interviews. *See* Pl.'s Ex. 4 at 141–45.

Six days later, on June 28, 2012, Cheatham notified Merriwether that he wished to withdraw the Complaint Against Walker, *see* Defs.' Stmt. ¶ 6 (citing Defs.' Ex. 1 at 134), stating

> While I do not agree with Mr. Walker's side of the story, I do agree that my supervisor has taken appropriate action to remove me from the situation (my reporting relationship) with Mr. Walker even though I have had to speak to [Hill] on 3 different times regarding his behavior. Having said that, since my last report to my supervisor, there have been no other issues that have come up and Mr. Walker's behavior has been adjusted[.]

Defs.' Ex. 1 at 134; *see also* Opp'n at 6. On July 2, 2012, Cheatham emailed Merriwether, requesting that he be provided a copy of the "final report for the informal charge." Defs.' Ex. 1 at 133. On the same day, Merriwether replied, advising that he was not entitled to a copy of the final report because he had withdrawn the Complaint Against Walker. *Id.* at 132. Cheatham replied back, stating" "[w]ell in that case[,] consider this closed[.]" *Id.*

On July 6, 2012, Cheatham's co-worker, Chapman, a Financial Policy Specialist in the

Policy Section, and the individual associated with the Third Allegation, contacted FEMA's EEO Office and alleged that Cheatham had sexually harassed her.  Defs.' Ex. 3 at 8 (citing ROI 127; AJ Ex. 5 at 197).  Chapman also reported the alleged sexual harassment to her direct supervisor, Nicole Gore.  *See id*. at 7 (quoting ROI 126; 195), 8 (citing ROI 111); Defs' Ex. 1 at 104, 108.

On July 16, 2012, Merriwether notified Cheatham that Chapman had contacted the Office of Equal Rights, alleging that he had sexually harassed her on multiple occasions ("Chapman's Complaint").  *See* Defs.' Stmt. ¶ 8 (citing Defs.' Ex. 1 at 129).  Merriwether also notified him that she was assigned as Chapman's counselor as part of the EEO pre-complaint process.  *See* Defs.' Stmt. ¶ 8 (citing Defs.' Ex. 1 at 129).

Subsequently, in late July and early August 2012, Cheatham emailed Hill to inform her that Walker was allegedly publicly discussing Chapman's Complaint, and that he had reason to believe that Walker was performing his own "investigation" without authority. *See* Defs. Ex. 1 at 195–96; Pl.'s Ex. 3, ECF No. 37-3, at 86, 91–2, 106.  According to Cheatham, Hill responded and indicated that she would tell Walker to cease any such behavior and, should it happen again and if Cheatham were able to provide additional specifics, she would initiate an investigation.  *See* Defs.' Ex. 1 at 196.

He then emailed Merriwether directly on August 6, 2012, expressing his concerns that FEMA was unfairly prioritizing Chapman's Complaint, and that he believed it was receiving "more attention in the informal stage" than the Complaint Against Walker had received.  *Id.* at 122–3; *see* Am. Compl. ¶¶ 19–21; Pl.'s Stmt. ¶ 45; Opp'n at 6, 13–14.  He asked why his allegations against Walker "seemed" to go "to the wayside" and were "now forgotten."  Defs.' Ex. 1 at 122–3.  He also stated, contrary to his prior assertions, *see* Defs.' Ex. 1 at 134, that Walker had continued the "assault of [his] character" and that he was not sure, *see* Pl.'s Stmt. ¶ 44, but

believed that it was Walker who convinced Chapman to accuse him of sexual harassment, Defs.'
Ex. 1 at 122–3.  As a result, Cheatham requested to reopen the Complaint Against Walker, and
also requested that it serve as counter-complaint against Chapman for filing false charges. He also
expressed his intention to potentially file a separate and additional complaint against Chapman
regarding her own alleged workplace misbehaviors.  *See id.*; Opp'n at 7.

On August 22, 2012, Cheatham attempted to notify the Office of the Attorney General of
his circumstances, *see* Defs.' Ex. 1 at 196–7, though it is unclear if anything came of those
attempts.  Then on August 24, 2012, Cheatham again informed Merriwether that he still had
"problems on how [his] case was handled with Mike Walker" and expressed the belief that the
Complaint Against Walker "was handled differently" than Chapman's Complaint.  *Id.* at 120–1.
Cheatham contends that his supervisors never pursued his "renewed complaint" against Walker.
*See* Pl.'s Stmt. ¶ 46.

Meanwhile, FEMA's Office of Chief Security Officer ("OCSO") proceeded with the
investigation of Chapman's Complaint.  Defs.' Stmt. ¶ 9 (citing Defs.' Ex. 1 at 73, 183 and *id.* at
Ex. 2).  Special Agent Lori Brannigan (Internal Investigations Branch), and the Fraud and Internal
Investigation Division were also assigned to the investigation. *See* Defs.' Ex. 1 at 211; Defs.' Ex.
2 at 3; Defs.' Ex. 3 at 9 (citing AJ Ex. 4 at 74).  These specific procedures were instituted because
Chapman's Complaint included an allegation of improper touching, *see* Defs. Ex. 1 at 109; Defs.'
Ex. 2 at 32, therefore, FEMA was mandated to investigate, through these particular channels,
allegations under the provisions of its policy against violence in the workplace, *see* Defs.' Ex. 3 at
10 (citing AJ ex. 4 at 74).

During the investigation, Brannigan interviewed co-worker Lantanya Drake.  She attested
that Chapman was "often approached" by Cheatham who "spoke to her, played with her, made

comments towards, and always looked her up and down." Defs.' Ex. 3 at 8 (quoting ROI 156). Drake indicated that Chapman was visibly annoyed and would often tell Cheatham to leave her alone. *Id.* Drake remembered specific raunchy and inappropriate comments that Cheatham allegedly made to Chapman about her appearance race, and age, and that he often purportedly tried to provoke Chapman to engage back with him. *Id.* (quoting ROI 156). Drake denied ever seeing Chapman reciprocate or initiate flirtation with Cheatham. *Id.* (citing ROI 157). According to Drake, while on smoke breaks, she, Chapman, and others, often "joked around[,]" but did not use vulgar language, and that only Cheatham would use vulgar language, which upset some of his co-workers. *Id.* at 8–9 (quoting ROI 157). Drake did not see Cheatham ever touch Chapman. *Id.* at 9.

According to Drake, Chapman personally told her she felt harassed, and that Chapman also reported the alleged harassment to Gore. *See id.* (citing ROI 158; AJ Ex. 4 at 95; AJ Ex. 5 at 219). Drake averred that she personally told Cheatham to "back off" Chapman, and that she was also really "upset" about the circumstances. *See id.* (quoting ROI 158; AJ Ex. 2 at 95). Drake stated that Cheatham stopped the alleged behavior for "about two weeks" before starting again. *Id.* (quoting ROI 158). Drake noted that Cheatham was "not a bad guy" in her opinion but that he was "very flirtatious towards the ladies." *Id.* (quoting ROI 160).

Brannigan interviewed Chapman, who attested that she had been subjected to alleged sexual harassment perpetrated by Cheatham multiple times since 2011. *Id.* at 10. She reported, verbatim, some of the same alleged inappropriate comments that he had repeatedly made to her, which had also been independently corroborated by Drake. *See* Defs. Ex. 2 at 14–15. Chapman stated that Cheatham repeatedly came into her workstation and sat on her desk flirtatiously, despite her requests for him to stop. *See id.* at 14. She also alleged that Cheatham had, unprovoked, given

her his personal phone number on a Post-It note, and she provided this note to Brannigan as evidence. *See id.* at 14–15. Chapman noted that, on two occasions, that Cheatham attempted to get her into an empty office with him. *Id.* at 15. She also reported that Cheatham had allegedly showed her graphic photos on his phone and made numerous sexual comments, both to her and about her, and about others. *See id.* She denied ever kissing him or initiating any type of physical contact. *See id.* at 9, 12. Next, she noted an alleged incident where Cheatham allegedly sexually harassed her outside the building, then followed her closely and aggressively into an elevator, and then upon leaving the elevator, made untoward comments while walking behind her. *Id* at 14. She indicated that, while contemplating reporting the behavior, she reached out to Drake, who asked Cheatham to stop on Chapman's behalf. *See id.* at 15. She also noted that at least three other women felt uncomfortable around Cheatham, namely, co-workers, Drake, Tammy Briscoe, and Rosalind Brown. When his alleged behavior did not stop, Chapman reached her "breaking point" and decided to report the alleged behavior to Gore. *Id.*

Brannigan also interviewed Briscoe. *See* Defs.' Ex. 2 at 25. Briscoe corroborated the Chapman's allegations regarding Cheatham's alleged persistent sexual harassment. Defs.' Ex. 3 at 10 (citing AJ Exs. 4 and 5 at 385). More specifically, she recalled "several occasions" when Cheatham was "disrespectful to [Chapman] in a sexual way." Defs.' Ex. 2 at 25. She also reported some of the same alleged charged comments – also separately corroborated by Drake and Chapman – that Cheatham made to Chapman about her appearance and race. She observed Cheatham allegedly "looking [Chapman] up and down" for extended periods of time on several occasions. *Id.* Chapman told Briscoe that she was bothered by it and wanted it to stop. Briscoe also reported that she found Cheatham's alleged behaviors "unprofessional" and that she was "offended as a woman by his actions and comments[.]" *Id.*

Akintola was also interviewed by Brannigan and testified[4] that was assigned to work on a project with Cheatham on her first day as an intern, and found Cheatham to be obviously "overly attentive and friendly to her and conveying a fe[e]ling of 'promiscuity' towards her." *Id.* at 30. She stated that Cheatham "put his hand on her back to walk her places throughout the office[,]" which made her uncomfortable. *Id.* Akintola testified that she felt continuously uncomfortable working with him but was "uncertain how to handle it[,]" and did not report her uncomfortable feelings to her supervisor when initially asked because she was trying to move on. *Id.* According to Akintola, she just did her best to avoid him on her own even though he was sexually harassing her. *See id.* at 32.

Cheatham was also interviewed, *see* Defs.' Ex. 1 at 73; Defs.' Ex. 2 at 8–9, 35–9, and he provided a written statement to Brannigan on September 4, 2012, *see* Defs.' Ex. 1 at 99, Defs.' Ex. 2 at 35, 40–58, and notarized the statement on September 5, *see* Pl.'s Ex. 1, ECF No. 37-1, at 120. In his interviews and statement, Cheatham consistently denied all of Akintola allegations, noting his suspicions that her allegations did not come to fruition until Chapman had raised her own. *See* Defs.' Ex. 1 at 189–90, 197–98. He also denied Chapman's allegations and maintained that he was the target of Chapman's continued aggressive sexual advances and comments, *see id.* at 187–205; Pl.'s Stmt. ¶¶ 24–43, which he "probably entertained[,]" Defs.' Ex. 1 at 200. He also attested that many of his co-workers engaged voluntarily in conversations of a graphic or bawdy nature during their breaks, and that it was, essentially, just part of the accepted workplace culture. *Id.* at 198–99; Pl.'s Stmt. ¶¶ 8–12. Cheatham also alleged that Chapman had approached him, kissed him on more than one occasion, and sexually taunted him. Defs.' Ex. 2 at 53–5; Defs.' Ex. 3 at 9

---

[4]     Cheatham states that Akintola's written statement is "unsigned [and] unattested to," Opp'n at 13 n.3, however, it is very clearly signed and dated (August 17, 2012 at 12:00 pm), *see* Defs.' Ex. 2 at 32.

(citing ROI 158); Defs.' Ex. at 187–205.  He stated that, after she had already kissed him, he began

consensually flirting with her, but only outside of work.  *See* Defs.' Ex. 2 at 35.  He indicated that

Drake would be able to corroborate his version of events. *Id*.  When then informed that Drake had

actually corroborated Chapman's version of events, Cheatham then indicated that Drake was lying

due to her own personal insecurities.  *See id.*; Defs.' Ex. 1 at 203.

Cheatham also alleged that Walker had orchestrated the charges against him because he

believed Walker to be sexually attracted to him, and when Cheatham spurned his advances, Walker

took lead in an overarching conspiracy to silence him and to get him fired.  *See id.* at 187–205. He

also contended that Hill and Merriwether intentionally failed to take action once notified because

they were complicit in the same scheme.  *See id.*

Ultimately, OCSO determined that Cheatham "had in fact sexually harassed" Chapman.

*Id.* at 73; Defs.' Ex. 2 at 5; *see* Defs.' Stmt. ¶ 10.   On September 6, 2012, five days before the

conclusion of Cheatham's probationary period, FEMA terminated his employment based on

OCSO's findings.  *See* Defs.' Stmt. ¶ 11; Pl.'s Stmt. ¶ 47 (citing ROI 00072).  The removal notice

indicated that

> [o]n July 6, 2012, one of your co-worke[rs] alleged you sexually harassed
> her in the workplace. As a result of the allegations, FEMA's Office of
> Chief Security Officer conducted an investigation. The investigation
> substantiated the allegation of sexual harassment. . .
>
> Your probationary period was a time for an assessment of your fitness for
> cooperating with fellow employees and for measuring your capacity to
> take responsibility for your actions in dealing with situations arising in a
> working environment. Your treatment of your co-worker demonstrates
> unfitness on both counts.

Defs.' Ex. 1 at 183.   FEMA did not consider any penalty other than removal because Cheatham

"was in his probationary time and this was a sexual harassment case that was substantiated." Defs.'

Ex. 3 at 11 (citing AJ Ex. 5 at 512).  FEMA's policy as to probationary employees is that "in most

cases, if a probationary or temporary employee's performance or conduct is unacceptable, termination of the appointment would be the most appropriate action." *Id.* (citing AJ Ex. 5 at 628).

Cheatham continues to emphatically deny all of Chapman's allegations and argues that they have been further undermined by contradictory deposition testimony. *See* Opp'n at 8–11. He contends that his termination was discriminatory as it was based upon "unsupported, non-factual, baseless, ingenuous allegations of sexual harassment against a female co-worker, and without ever acknowledging or investigating Cheatham's original, repeated charges of sexual harassment against" Walker. Am. Compl. ¶ 22.

He filed an appeal with the Merit Systems Protection Board on September 14, 2012, alleging wrongful termination. Defs.' Stmt. ¶ 12 (citing Defs.' Ex. 3 at 2). MSPB dismissed the appeal for lack of jurisdiction because Cheatham was a probationary employee at the time of his termination. *Id.* ¶ 13 (citing Defs.' Ex. 3 at 2). He then sought EEO counseling on October 9, 2012, Defs.' Ex. 3 at 2, and on November 16, 2012, filed a formal EEO Complaint ("First EEO Complaint"), No. HS-FEMA-00116-2013, with the Office of Equal Rights, alleging discrimination based on gender and sex (male) that resulted in wrongful termination without due process. Compl. ¶ 27; *see* Defs.' Ex. 1 at 45.

Sometime after his termination, Cheatham learned through a FOIA request, that FEMA had investigated him for theft of government property; Cheatham had failed to return the second of his two work-issued laptop computers. *See* Am. Compl. ¶ 23; Defs.' Ex. 3 at 25. On September 25, 2012, FEMA Responsible Management Official, Winona Cason, contacted FEMA's Labor Relations Department to recover the laptop. Def.'s Ex. 3 at 11 (citing AJ Ex. 4 at 11, 178). Cheatham alleges that the laptop theft investigation was somehow orchestrated to thwart his employment prospects. *See* Pl.'s Stmt. ¶¶ 50–2. He also alleges that he was unable to submit an

affidavit in his own defense before the investigation was closed. *See id*. ¶¶ 48–50 (citing Pl.'s Ex. 1 at 15–16); Opp'n at 15. However, when Cheatham returned the laptop on November 16, 2012, FEMA fully closed its investigation in his favor. Defs.' Stmt. ¶ 16 (citing Defs.' Ex. 3 at 11).

Cheatham alleges that FEMA hindered his ability to obtain other employment in yet other ways. *See* Am. Compl. ¶¶ 24–6. First, Cheatham maintains that, in January 2013, he became aware that FEMA unfairly "precluded him" from competing for one of the agency's own employment opportunities, namely, Announcement #MG-2012-T0433-BLG-778372MP for position GS-0510-13/14. *See* Am. Compl. ¶ 26. He alleges that FEMA unfairly deemed him "ineligible" for the position, when in fact, he should have been eligible under the Veterans Equal Employment Opportunity Act, as . . . a disabled Gulf War combat veteran[.]" Am. Compl. ¶ 26. FEMA attests that Cheatham was deemed ineligible because the position was open to "Current FEMA Status Candidates Only[.]" Defs.' Stmt. ¶ 19 (quoting Defs.' Ex. 1 at 241, 250). He was formally notified of same on January 24, 2013. Defs.' Ex. 3 at 11 (citing ROI 253).

Second, on April 30, 2013, the United States Marine Corps, *vis-à-vis*, the Department of Navy ("Navy") rescinded a tentative job offer from January 2, 2013, after it received FEMA's response to his reference check. *See id.* (citing ROI 266); Am. Compl. ¶ 25. Navy informed Cheatham that the position was "contingent upon the fulfillment of preemployment conditions," and that his employment was "not firm until an applicant receives a firm or final offer[.]" Defs' Ex. 1 at 263. Because Cheatham had been fired during his probationary period, and because his FEMA "indicated one of the bases for termination was inappropriate conduct towards others," he was removed from consideration for the Navy position, *see id.*, in part, because Cheatham had indicated to Navy that his termination from FEMA was for reasons other than misconduct, *see* Defs.' Ex. 3 at 11 (citing ROI 266). Instead, Cheatham had falsely reported that he had been

"subjected to a Reduction in Force ("RIF") and was therefore not granted permanent status[.]" *Id.* at 12 (quoting ROI 266).

Third, Cheatham contends that the Defense Contract Audit Agency ("DCAA") declined to consider him for four different employment opportunities – Supervisory Auditor, GS-0511-13, Vacancy Announcement #760590, Supervisory Auditor, GS-0511-13, Vacancy Announcement #793411, Supervisory Auditor, GS-0511-13, Vacancy Announcement #749806, and Supervisory Auditor, GS-0511-13, Vacancy Announcement # 875873 – based on the reference check that FEMA provided to DCAA.   Am. Compl. ¶ 24.   He was advised that he was removed from consideration "due to suitability," noting the "circumstances and recency" of his separation from FEMA and "sustain[ing] management's objections[.]"   Defs.' Stmt. ¶ 16 (quoting Defs.' Ex. 1 at 278–79).

In her testimony, Hill agreed that she received reference calls from prospective employers regarding Cheatham's employment record.   *See* Defs.' Ex. 3 at 12 (citing AJ Ex. 5 at 514).   Hill testified that she did not personally handle the references and forwarded these callers to the Agency's Labor Relations contact, Kelley Stevens.   *See id.*

On February 22, 2013, Cheatham requested to supplement the First EEO Complaint by adding retaliation allegations arising from the laptop theft investigation and his non-selection for the noted employment opportunities.   *Id*. ¶ 20 (citing Defs.' Ex. 1 at 80).   Initially, the Office of Equal Rights concluded these allegations were unrelated to his original claim.   *Id.*   Consequently, after separate and expedited counseling on these additional allegations, Cheatham then filed a second formal EEO Complaint ("Second EEO Complaint"), No. HS-FEMA-00868-2013, containing these additional allegations, on March 19, 2013.   *Id.* ¶¶ 20–1 (citing Defs.' Ex. 1 at 82).

On April 26, 2013, the First and Second EEO Complaints were consolidated for processing,

Defs.' Ex. 3 at 2 (citing ROI 93), and on May 24, 2013, the EEO investigator commenced investigation of the consolidated complaints, *id*.  During the majority of the EEO investigation, Cheatham was represented by counsel.  *See id.* at 3–4.

Cheatham submitted additional amendments, first on May 7, 2013, and then on June 17, 2013,  Defs.' Stmt. ¶ 21 (citing Defs.' Ex. 1 at 86), providing additional detail regarding his non-selections, *see* Defs.' Ex. 1 at 86–88.  On August 14, 2013, Cheatham also amended the First EEO complaint,  *id.* ¶ 22 (citing Defs.' Ex. 1 at 90–2), providing additional details regarding: (1) the laptop theft allegations, (2) Hill's allegedly retaliatory behavior, and (3) affidavits submitted by FEMA that Cheatham contended were improperly executed, *see* Defs.' Ex. 1 at 91.

On July 29, 2014, and following the exchange of various motions, and transfer of the matter to the Miami District Office, *see* Defs.' Ex. 3 at 4, FEMA's Final Formal ROI was submitted to the parties and to the EEO Commission, which encompassed both the First and Second EEO Complaints, and all of Cheatham's subsequent amendments, *id*.; Defs.' Stmt. ¶ 23 (citing Defs.' Ex. 1 at 323).

On May 24, 2016, FEMA filed a Motion for Summary Judgment, opposed by Cheatham, which was granted by the Miami District Office AJ in May 2017.  Defs.' Stmt. ¶ 24; Defs.' Ex. 3 at 4 (citing AJ Exs. 4, 5, and 6).  The AJ determined that Cheatham was not discriminated against based upon his sex or gender or in reprisal for his prior EEO activity.  Defs.' Stmt. ¶ 25 (citing Defs.' Ex. 3 at 26–7).  In June 2017, FEMA issued a Final Order that implemented the AJ's entry of summary judgment, *id.* ¶ 26 (citing Defs.' Ex. 4, ECF No. 35-6, at 2), and shortly thereafter, Cheatham filed an appeal of that Order with the EEO Commission, *id.* ¶ 27 (citing Defs.' Ex. 4); Am. Compl. ¶ 28, and on October 26, 2018, the Commission affirmed FEMA's Final Order, *see* ¶ 27 (citing Defs.' Ex. 4); Am. Compl. ¶ 29.

### III.    LEGAL STANDARDS

Defendants move to dismiss, pursuant to Federal Rule 12(b)(1), Counts II through V, and also move for summary judgment,[5] pursuant to Federal Rule 56, as to Count I and any other intended Title VII-based sex and gender discrimination and retaliation claims. *See* Defs.' Mem. at 1.

Subject Matter Jurisdiction

Under Rule 12(b)(1), a plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F. 3d 970, 971 (D.C. Cir. 2003) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)). Further, a court is required to dismiss an action "at any time" if it determines that the subject matter jurisdiction is wanting. *See* Fed. R. Civ. P. 12(h)(3).

When reviewing a challenge pursuant to Rule 12(b)(1), a court may consider documents outside the pleadings to assure itself that it has jurisdiction. *See Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (holding same); *see also Artis v. Greenspan*, 223 F. Supp. 2d 149, 152 (D.D.C. 2002) ("A court may consider material outside

---

[5]    Defendants also move to dismiss Count I and any Title VII claims pursuant to Rule 12(b)(6). *See* Defs.' Mem. at 1. Because, based on its review of the full record, the court finds summary judgment more appropriate at this stage, it declines to address the Rule 12(b)(6) arguments.

of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject-matter jurisdiction.)."  And by considering documents outside the pleadings when reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court does not convert the motion into one for summary judgment; "the plain language of Rule 12(b) permits only a 12(b)(6) motion to be converted into a motion for summary judgment" when documents extraneous to the pleadings are considered by a court.  *Haase*, 835 F.2d at 905.

<u>Summary Judgment</u>

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, a court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson,* 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of their position.  *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in their favor.  *Id.*  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50 (citations omitted).

## IV.  DISCUSSION

<u>Section 1981 Claims</u>

The Court may not exercise subject matter jurisdiction over any of Cheatham's claims for alleged violations of Section 1981.  "[T]he protection offered under 42 U.S.C. § 1981 is limited in its scope," and "applies only to 'nongovernmental discrimination and impairment under color of State law.' " *Marcus v. Geithner*, 813 F. Supp. 2d 11, 19 (D.D.C. 2011) (citing 42 U.S.C. § 1981(c)).  "The statute does not apply to actions taken under color of federal law." *Id.* (citation and internal quotation marks omitted).

Here, Cheatham's 1981 claims are raised against a federal instrumentality and its unnamed employees, and therefore, they cannot survive dismissal. *See id.* (citing *Kizas v. Webster*, 707 F.2d 524, 541–43 (D.C. Cir. 1983)); *see also DynaLantic Corp. v. Dep't of Defense*, 885 F. Supp. 2d 237, 291 (D.D.C. 2012) ("Section 1981 does not apply to actions taken under the color of federal law, nor does it permit suit against instrumentalities of the federal government."), *appeal dismissed*, Nos. 12–5329, 12–5330, 2013 WL 4711715 (D.C. Cir. July 16, 2013); *accord Turner v. Shinseki*, 824 F. Supp. 2d 99, 113 n.15 (D.D.C. 2011); *Prince v. Rice*, 453 F. Supp. 2d 14, 25 (D.D.C. 2006). And "a federal employee who is covered by [Title VII] may not sue under section 1981." *Torre v. Barry*, 661 F.2d 1371, 1374 (D.C. Cir. 1981).

Furthermore, Cheatham alleges that he suffered retaliation due to his sex and gender, but "Section 1981 protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts without respect to race[,]" *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (citations and internal quotation marks omitted). While Section 1981 "proscribes discrimination based solely on race," *Cromeartie v. RCM of Washington, Inc.*, 118 F. Supp. 3d 335, 338 (D.D.C. 2015), it does not proscribe discrimination based on sex or gender, *see Runyon*

*v. McCrary*, 427 U.S. 160, 167 (1976); *Bello v. Howard Univ.*, 898 F. Supp. 2d 213, 219 (D.D.C. 2012). Because Cheatham has not raised claims for discrimination based on his race, in either his administrative actions or in this matter, and because Section 1981 is inapplicable to sex or gender claims, his allegations pursuant to Section 1981 may not proceed.

For all of these reasons, Defendants' Motion to Dismiss will be granted as to all Section 1981 claims, contained in Counts II through V.

<u>Title VII Claims</u>

While Cheatham cannot raise his claims under Section 1981, he may bring them pursuant to Title VII. *See Brown v. GSA*, 425 U.S. 820, 835 (1976) ("[T]he exclusive judicial remedy for claims of discrimination in federal employment."). Cheatham has explicitly raised a discriminatory discharge claims pursuant to Title VII, *see* Am. Compl. ¶¶ 32–6, and though he attempted to raise his claims for retaliation under Title VII, because *pro se* complaints are held "to less stringent standards than formal pleadings drafted by lawyers[,]" *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), the Court will instead generously construe them under the proper statute.  Notwithstanding, Cheatham's discrimination and retaliation claims cannot survive summary judgment.

Under Title VII, an employer shall not "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race [.]"  42 U.S.C. § 2000e-2(a)(1).  In addition, under Title VII's anti-retaliation provision, an employer may not "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* § 2000e–3(a).

Stating a *prima facie* case of Title VII discrimination or retaliation is not a difficult feat. To *plead* discrimination, a plaintiff need only show that he is a member of a protected class who suffered an adverse employment action that gives rise to an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002).  And where, as here, a man raises a claim for sex or gender discrimination, the court takes account that men, unlike women, are "member[s] of a historically favored group," and hence do not belong to a protected class.  *Potts v. Howard Univ. Hosp.*, 736 F. Supp. 2d 87, 93 (D.D.C. 2010) (quoting *Bell v. Runyon*, 1997 WL 540814, at *2 (D.D.C. July 17, 1997) and citing *Bryant v. Leavitt*, 475 F. Supp. 2d 15, 25–6 (D.D.C. 2007) (other citation omitted)). Thus, a male plaintiff must establish a *prima facie* case by presenting evidence of background circumstances that support an inference of discrimination.  *Bryant*, 475 F. Supp. 2d at 25 (citing  *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993)).  Two general categories may then satisfy indicia of these background circumstances: (1) evidence showing that an employer has some reason or inclination to discriminate against males, and (2) "evidence indicating that 'there is something fishy about the facts of the case at hand that raises an inference of discrimination.' " *See Mastro v. Potomac Elec. Power Co*., 447 F.3d 843, 851 (D.C. Cir. 2006), *cert. denied*, 549 U.S. 1166 (2007) (quoting *Harding*, 9 F.3d at 153).

To sufficiently *plead* a claim of Title VII retaliation, a plaintiff must sufficiently allege that he engaged in activity protected under Title VII and, as a direct consequence, suffered a materially adverse employment action.  *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).

To *prove* a Title VII violation, however, a plaintiff must demonstrate by a preponderance of the evidence that the actions taken were "more likely than not based on the consideration of impermissible factors" such as sex or gender. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal quotation marks and citation omitted).  The claim may be proven by direct or

circumstantial evidence. *Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016), *cert. denied*, 137 S.Ct. 2159 (2017).   Direct evidence of discriminatory intent is, for instance, a statement explicitly expressing sex or gender bias.   *See Robinson v. Red Coats, Inc*., 31 F. Supp. 3d 201, 216 (D.D.C. 2014).   But most commonly where, as here, the record contains no direct evidence, Title VII claims are then analyzed under the burden-shifting framework set forth *in McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).   *See Mastro,* 447 F.3d at 850; *accord Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Under that framework, Cheatham bears the initial burden of pleading a *prima facie* case of discrimination and retaliation, and thereafter, the burden shifts to Defendants to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.

Notably, Defendants' burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254.  As such, "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Morgan v. Fed. Home Loan Mortgage Corp*., 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881 (2003); *see also Burdine*, 450 U.S. at 253.

Once an employer asserts a legitimate, non-discriminatory reason for the adverse decision, "the *prima-facie*-case aspect . . . [becomes] irrelevant" and the Court is left with "one central inquiry" of whether the plaintiff has "produced evidence sufficient for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v.*

*District of Columbia*, 525 F.3d 1222, 1226 (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008)), *cert. denied*, 555 U.S. 1036 (2008).

Put differently, Cheatham "bears the ultimate burden of proving that discriminatory [or retaliatory] animus was the determining cause of the personnel action." *Lancaster v. Vance–Cooks*, 967 F. Supp. 2d 375, 393 (D.D.C. Sept. 26, 2013) (citing *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (other citation omitted)).   Pretext may be established by showing either "that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. However, courts "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.' " *Fischbach v. District of Columbia Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

## I.    *Discriminatory Termination*

Defendants' have set forth legitimate non-discriminatory reasons for Cheatham's termination. More specifically, FEMA found that Chapman's sexual harassment charge against Cheatham was substantiated, and as such, Cheatham failed to demonstrate that he was able to cooperate with fellow employees or to take responsibility for his actions.  *See* Defs.' Ex. 1 at 183. FEMA conducted a well-researched investigation that supported its findings.  As discussed, Chapman, Drake, and Briscoe were all interviewed in detail, and independently corroborated Chapman's claims.  *See* Defs.' Ex. 2 at 12–15, 19–23, 25–8.  Ankintola was also interviewed and separately alleged the Cheatham was sexually inappropriate with her and made her feel uncomfortable. *See id.* at 30–2.

Thus, whether Cheatham made out a *prima facie* case is no longer relevant, and the Court turns directly to the issue of whether he has produced evidence sufficient for a reasonable jury to

find that FEMA's stated reason was not the actual reason for his termination, but rather pretext for

discrimination. *See Brady*, 520 F.3d at 495; *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139,

1154 (D.C. Cir. 2004).  In order to show pretext, a plaintiff must present evidence that allows "the

trier of fact to infer the ultimate fact of discrimination [or retaliation] from the falsity of the

employer's explanation." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 147 (2000).

Such evidence may include: "the employer's better treatment of similarly situated employees

outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from

established procedures or criteria, [ ] the employer's pattern of poor treatment of other employees

in the same protected group as plaintiff, or other relevant evidence that a jury could reasonably

conclude evinces an illicit motive." *Wheeler v. Georgetown Univ. Hosp*., 812 F.3d 1109, 1115

(D.C. Cir. 2016) (quoting *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (internal

quotation marks omitted)).

Ultimately, however, where "the employer's stated belief about the underlying facts is

reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude

that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.  In other words, "an

employer's action may be justified by a reasonable belief in the validity of the reason given even

though that reason may turn out to be false." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005);

*see also Fischbach*, 86 F.3d at 1183 ("Once the employer has articulated a non-discriminatory

explanation for its action the issue is not the correctness or desirability of the reasons offered but

whether the employer honestly believes in the reasons it offers.").  The Court is thus concerned

only with "[t]he ultimate question [of] whether the employer intentionally discriminated, and proof

that 'the employer's proffered reason is unpersuasive . . . does not necessarily establish that the

plaintiff's proffered reason . . . is correct.' " *Reeves*, 530 U.S. at 146–47 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 524 (1993)).

*a.*      *Disparate Treatment*

In rebuttal, Cheatham first argues that discriminatory pretext can be gleaned from the alleged disparate treatment he received, highlighted by the inferior handling of his Complaint Against Walker, versus FEMA's alleged preferential treatment of Chapman's Complaint.  In these circumstances, there is a two-fold analysis of comparability.  *See Needham v. BI, Inc*., No. 00-C-1550, 2001 WL 558144 at *6–7 (N.D. Ill. May 21, 2001) (assessing whether a male employee and female employee were similarly situated by reviewing both their respective employment circumstances and the nature of their sexual harassment complaints).

First, it does not appear that Walker and Chapman are appropriate comparators, in other words, that the relevant aspects of their employment circumstances are directly comparable in all material respects.  *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008).  To meet this standard, Cheatham and Chapman must have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Phillips v. Holladay Prop. Servs., Inc*., 937 F. Supp. 32, 37 (D.D.C. 1996) (internal quotation marks omitted).

 Cheatham was as an Accountant with the Internal Controls Unit within the Risk Management and Compliance Division of the Office of the Chief Financial Officer, Defs.' Ex. 1 at 97, and Chapman was a Financial Policy Specialist in the Policy Branch, *id.* at 167; *see also* Defs. Ex. 2 at 13.  Therefore, Cheatham and Chapman were not in the same work group or department, nor were they in the same chain of command, and though Chapman sometimes crossed

25

paths with Hill, they did not formally report to the same supervisors. *See* Defs.' Ex. 1 at 104, 108. Additionally, Cheatham was a probationary employee, *see* Am. Compl. ¶¶ 3, 22, and Chapman was not, *see* Defs.' Ex. 2 at 15. The District of Columbia Circuit has held that "probationary employees and permanent employees are not similarly situated," and that "under federal regulations, probationary employees may be terminated for problems even if those problems would not be good cause for terminating a permanent employee." *George*, 407 F.3d at 415 (citing cases and 5 C.F.R. §§ 315.801–.806).

Second, the nature of their Complaints differed. Though they both involved some allegations of sexual harassment, Chapman's Complaint initially alleged inappropriate physical contact, *see* Defs.' Ex. 1 at 109, a distinction of consequence because it mandated discrete methods of investigation under FEMA's policy against violence in the workplace. *See* Defs.' Ex. 3 at 10 (citing AJ ex. 4 at 74). Unlike Chapman, Cheatham never alleged that Walker engaged in any inappropriate physical contact. *See* Defs.' Ex. 1 at 97–8. Furthermore, Chapman's Complaint ultimately revealed allegations by additional female co-workers, which then also had to be explored. *See* Defs.' Ex. 2 at 19, 25, 30, 98. On the other hand, Cheatham raised sexual harassment claims against Walker, but the bulk of that Complaint focused on his alleged fabrication of the charges against Cheatham. In sum, there is little to suggest that Cheatham and Chapman are similarly situated. *See Hayes v. Indianapolis Osteopathic Hosp., Inc*., No. 08–cv–0938–RLY–TAB, 2010 WL 2838524 at *8 (S.D. Ind. July 19, 2010) (finding proposed comparators were not similarly situated where defendant terminated male plaintiff after he engaged in sexually harassing conduct toward multiple women over a seven-month period causing female employees to avoid interaction with him, versus the treatment of plaintiff's complaint against two other co-workers who allegedly engaged in a single incident of harassing conduct that was only reported by the

plaintiff); *see also Needham*, 2001 WL 558144 at *7 (finding that female employee was not similarly situated to male employee because the male employee's complaint consisted of allegations involving a co-worker's inappropriate discussion of her social life, and the female employee's complaint involved plaintiff's alleged inappropriate touching and staring).

Even assuming *arguendo* that Cheatham, Chapman, and their respective Complaints, were similarly situated, Cheatham nonetheless fails to prove that Chapman was treated more favorably. It is notable that Cheatham voluntarily withdrew the Complaint Against Walker, explicitly noting that he considered the case "closed," Defs.' Ex. 1 at 132, and in doing so, expressed his satisfaction with the outcome, *see id.* at 134. And despite Cheatham's contentions to the contrary, his claims were investigated prior to his voluntary withdrawal. Both Hill, *see* Pl.'s Ex. 3 at 76–82, and Merriwether, *see* Defs.' Ex. 1 at 140–41, took prompt action on the claims and were communicative with Cheatham.

He also seemingly argues that the Complaint Against Walker was only investigated by Hill, when Chapman's Complaint was forwarded to Hill's first- and second-line supervisors, including Cason, which he believes indicates some sort of conspiracy. *See* Opp'n at 6; Defs.' Ex. 1 at 297. However, the record reflects that both Complaints were brought to Cason's attention. *See* Defs. Ex. 1 at 106, 108–110. Cheatham is also suspicious as to why Chapman's Complaint was handled by the Fraud and Internal Investigation Division, *see* Opp'n at 6, but as discussed, it required distinct consideration based on the allegation of unwanted touching under FEMA's policy against violence in the workplace, *see* Defs.' Ex. 3 at 10 (citing AJ ex. 4 at 74).

Cheatham next contends that disparate treatment is evidenced by his unfulfilled attempts to reopen the withdrawn Complaint Against Walker. *See* Opp'n at 7. He also sought to supplement the reopened Complaint with a disparate treatment charge, and for it to serve as a counterclaim

against Chapman.  *See* Opp'n at 7; *see also* Defs.' Ex 1 at 122–24.  He maintains that Defendants ignored his requests to initiate EEO counseling, failed to provide him with advice, and did not investigate his renewed claims.  *See* Opp'n at 7.  But the record shows that Merriwether responded to Cheatham's request, at least in part.  *See* Defs.' Ex. 1 at 119–121.  It also appears that Chapman actually filed both an informal and formal internal complaint, *see* Pl.'s Ex. 1 at 96–8, and Cheatham did not file either, at least not during his attempt to reopen, *see* Defs.' Ex. 1 at 194 (Cheatham stating that that "[i]n retrospection, I should have entered into the formal process at that time to keep the matter relevant.").  And per Cheatham's own admission in the record, after requesting "assistance from the [FEMA] Employee Assistance Program (EAP) to seek counseling for the way [he] was being treated by MW [Walker] and KH [Hill][,]" he then, in fact, "attended an EEO counseling session on August 10, 2012."  *Id.*

And while FEMA did not separately reopen the Complaint Against Walker, most of Cheatham's claims were nonetheless investigated.  His request to reopen was, in large part, a direct response to Chapman's Complaint; it served as a denial of Chapman's allegations based on his contention that Walker had orchestrated them. Therefore, the investigation into Chapman's Complaint, in turn, explored many of Cheatham's renewed claims against Walker, as they were part and parcel of related circumstances.  For example, Walker submitted a written statement addressing Cheatham's renewed claims against him.  *See* Pl.'s Ex. 3 at 83–6.  Brannigan noted that she explicitly considered Cheatham's "counter allegations against both Amanda Fenwick-Chapman and his Team Lead, Michael Walker. . . (JIB Case Number 214-2012)[,]" but ultimately found that "[w]itness testimony . . . corroborate[d] the allegations brought forth by Amanda Fenwick-Chapman[.]"  Defs.' Ex. 2 at 5, 35.  Therefore, even if Cheatham and Chapman, and their respective Complaints, were similarly situated, there is no evidence of disparate treatment.

### b.    Pretext for Discrimination

Cheatham next argues that the Court may glean pretext from what he perceives as "serious credibility issues with the Defendant[]s['] witnesses." Opp'n at 8.  For example, he highlights inconsistencies regarding certain details in Chapman's testimony, for example: (1) whether the Post-It would have remained in the trash after custodial services had cleaned to be later retrieved by Chapman as evidence; (2) whether he would have suggestively discussed plans for his birthday months beyond the actual date; (3) nuances regarding Chapman's purported persona as a "black widow," and; (4) Chapman's inability to remember small exhaustive details. *See id.* at 8–9.  None of these topics, however, standing alone or considered together, are substantive to the issues at hand, and considering them would intreat the Court to speculate.

Similarly, Cheatham argues that, in their depositions, Hill and Walker sometimes displayed nervous and/or contrary attitudes, initially forgot certain circumstances, or were occasionally confused, and refused to answer to particular questions. *See id.* at 10–11.  In support, he points to a September 26, 2012 email chain between Cason and Hill, in which they discuss the ROI and the necessity for Cason to review it in relation to the laptop theft investigation. *See id.* at 10–11, 24; Pl.'s Ex. 1 at 15–16.  In the email chain discussion, there is an inference that one or both of them may have been reading the ROI for the first time, though it is far from clear. Plaintiff reads this to mean that Hill terminated his employment prior to reading the ROI. *See id*.

In Hill's deposition, however, she testified that while she could not exactly remember, she was fairly certain that she had received the ROI in early September and that she would likely not have approved Labor Employee Relations' termination letter if she had not already reviewed it. Pl.'s Ex. 3 at 49–50, 63; *see also* Defs.' Ex. 1 at 73 (noting that Hill reported that "the Security Office determined that [Cheatham] had in fact sexually harassed [Chapman]" and that Cheatham

"was terminated, after conferring with LER [Labor Relations], based on the outcome, based on the outcome of the Security Office formal investigation" and that the termination was a "joint decision made between [Hill] and . . . [LER] after receiving a preliminary report of inquiry conducted by FEMA's Office of Equal Rights.")

The record shows that Hill was continuously involved and fully acquainted with the circumstances and factors giving rise to Cheatham's termination, both as the Director of Risk Management, and as his direct supervisor, and that the decision to terminate him was finalized, not just by Hill, but in conjunction with the Security Office and the Office of Labor Relations, among others. *See id*. And these noted negligible credibility issues of witnesses cannot constitute "[t]he mere existence of a scintilla of evidence in support of" Cheatham's position. *Liberty Lobby*, 477 U.S. at 252. Furthermore, at the summary judgment stage in a Title VII action, the Court need not decide "whether the evidence is credible," *St. Mary's Honor Ctr*, 509 U.S. at 518–19, and cannot serve as a substitute for actual pretext.

Next, Cheatham attempts to highlights as pretext his "assertion that Fenwick-Chapman kissed him twice on May 11, 2012, [which] is corroborated" by co-worker Omolara Toler's testimony. Pl.'s Opp'n at 9 (citing ROI 123-24). Toler testified that, on May 11, Cheatham told her that Chapman had kissed him. *See id*. The Court notes that, while Toler did testify in this manner, Toler had no actual personal knowledge of the incident beyond Cheatham's own self-reporting, and she admittedly bore witness to nothing. *See* Defs.' Ex. 1 at 11. ("Toler asserts that she did not witness[] the incident between the Complainant and Ms. Fenwick-Chapman; however, the Complainant informed her that Ms. Fenwick-Chapman entered his office space, kissed him, and made romantic and sexual advances towards him."). Thus, the court can put little stock in this information, given the volume of first-hand information available that supported FEMA's findings.

Cheatham next focuses again on the nature of the investigation into Chapman's Complaint, noting that it was incomplete because he "submitted a sworn statement on September 5, 2012" and that the investigation was closed on the same date, and Cheatham was terminated on September 6, 2012.  Opp'n at 15.  He states that "[i]n essence, the investigation was closed even before Cheatham submitted a sworn statement, and Defendant failed to investigate any of Plaintiff's concerns and counter allegations[.]"[6]  *Id.*  However, Cheatham submitted his written statement on September 4, *see* Defs.' Ex. 1 at 99, Defs.' Ex. 2 at 35, 40–58, and then *certified* it on September 5, *see* Pl.'s Ex. 1, ECF No. 37-1, at 120.  The ROI notes that his written statement – and his arguments and counter-allegations – were all considered, and that his statement was incorporated therein.  *See* Defs.' Ex. 2 at 5, 35.  Cheatham had also been interviewed in late August, before the submission of the written statement.  *See id*. at 8–9, 35–9; Defs.' Ex. 1 at 73.

Additionally, most of the witnesses identified by Cheatham, for example, Drake and Briscoe, *see* Defs.' Ex. 1 at 188–89, 198–203, were, in fact, interviewed and did not corroborate his version of events, *see* Defs.' Ex. 2 at 19–23, 25–8.  Toler, and another co-worker, Tami Smith were identified by Cheatham, but were not interviewed by Brannigan, *see* Defs. Ex. 1 at 190, 201, but they were interviewed later as part of the formal EEO investigation, *see id.* at 11–12.  They testified that they had never witnessed Cheatham harassing Chapman, but also testified that they

---

[6]      To the extent that Cheatham may raise a claim for due process violation, *see* Am. Compl. ¶¶ 19, 22, 33 he may not do so.  A federal probationary employee is considered "at-will" and generally lacks an expectancy of job retention requiring procedural protection under the due process clause. *See Piroglu v. Coleman*, 25 F.3d 1098, 1104 (D.C. Cir. 1994) (collecting cases), *cert. denied*, 513 U.S. 1147 (1995); *see also Hall v. Ford*, 856 F.2d 255, 311–13 (D.C. Cir. 1988) (finding that probationary federal employees are terminable at will, and therefore, have no due process interest because there is no objective basis for believing that they will continue to be employed indefinitely). Cheatham offers no argument or authority to counter that he was somehow more than an at-will employee.  As a result, there is no basis for any claims arising from alleged violation of Cheatham's due process rights.  Additionally, and as noted, Cheatham received ample opportunity to present defenses to the claims against him.

had never witnessed Chapman harassing Cheatham in any manner.  *See id*. at 12.  Both Smith and

Toler also disavowed "any awareness or knowledge of [Cheatham] being concerned about being

the victim of undesired advances and/or sexual harassment by Mr. Walker." *Id.*

Therefore, the record shows that nearly all of the witnesses corroborated Chapman's

claims, and those who did not corroborate them simply lacked any personal knowledge, and

similarly, could not corroborate any of Cheatham's allegations.  Brannigan conducted multiple

witness interviews, and the Court declines to speculate as to the co-workers were left un-

interviewed, because the Court does not sit as "super-personnel department that reexamines an

entity's business decisions." *Fischbach*, 86 F.3d at 1183 (internal citation and quotation marks

omitted).  Here, Brannigan conducted a "comprehensive investigation[,]" and interviewed several

employees, and the Court cannot "play micro-manager and decide whether [she] asked all the right

questions and interviewed all the right people." *Needham*, 2001 WL 55814 at *8 (granting

summary judgment as to claims for sex and gender discrimination where some of plaintiff's

complaints did not make their way to the investigator as there was no evidence of foul-play and

"after all of the interviews were complete, [the investigator] drew her conclusions. . . [and]

honestly believed these conclusions to be true[.]")

Finally, Cheatham argues that he "is entitled to a spoliation inference[,]" because he

requested in discovery, and did not receive, "all security recordings for July 6, 2012, which would

have disproven Fenwick-Chapman's allegations that Cheatham engaged with Fenwick-Chapman

other than to ask one brief question about travel."  Opp'n at 11. The Court agrees that "[a] party

has a duty to preserve potentially relevant evidence  . . . once [that party] anticipates litigation."

*Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011) (internal quotation marks

omitted).  "A sanction for failure to preserve evidence is appropriate only when a party has

consciously disregarded its obligation to do so." *Shepherd v. Am. Broad. Cos. Inc*., 62 F.3d 1469, 1481 (D.C. Cir. 1995). "The party seeking sanctions bears an evidentiary burden that is calibrated to ensure that the gravity of the sanction corresponds to the conduct . . .  [;][a] party seeking an issue-related sanction need only put forth a preponderance of the evidence, but a party seeking a penal sanction must put forth clear and convincing evidence before sanctions are warranted." *Clarke v. Wash. Metro. Area Transit Auth*., 904 F. Supp. 2d 11, 20–1 (D.D.C. 2012) (citing *Shepherd*, 62 F.3d at 1477–79), *aff'd*, 540 Fed. Appx. 3 (D.C. Cir. 2013).

Here, however, FEMA attested in discovery responses that "no such footage" existed, Reply at 9 (citing Pl.'s Ex. 1 at 140–41), which simply cannot necessitate an inference that Defendants destroyed or knowingly disregarded it, and Cheatham provides nothing else in support of his spoliation claim. Without any evidence that FEMA destroyed or failed to preserve any records, sanctions cannot be imposed.

Assessing all the relevant circumstances, and reviewing the entire record, Cheatham has failed to produce sufficient evidence from which a reasonable jury could find that FEMA terminated his probationary employment on a prohibited basis. To the contrary, FEMA has presented substantial support for its legitimate, non-retaliatory reasons for dismissing Cheatham. If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Ultimately, Cheatham's speculative assertions are not enough to defeat summary judgment as to discriminatory discharge. *See Dist. Intown Props. Ltd. P'ship v. Dist. of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must assume the truth of all statements proffered by the

non-movant except for conclusory allegations lacking any factual basis in the record."), *cert. denied*, 531 U.S. 812 (2000).  An employer is entitled to summary judgment as a matter of law "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148  (citation omitted).

And notably, Cheatham has failed to present evidence showing any connection between his sex or gender and FEMA's actions, other than conclusory accusations.  His insistence that Walker allegedly coerced Chapman to file the claims against him actually "undercut[s] a claim of discrimination because [it] suggest[s]" that it was Walker, and not Chapman, who attempted to eliminate him, which somehow undermines an animus based on sex or gender.  *See Durden v. MTA*, No. 17-CV-05558, 2018 WL 4658806 at *8–9 (S.D.N.Y. May 18, 2018) (dismissing gender discrimination claim and finding that an alleged vengeful sexual harassment complaint against plaintiff "did not sustain the minimal burden of showing discriminatory intent[.]") (citing *Franchino v. Terence Cardinal Cook Health Care Ctr., Inc*., 692 F. App'x 39, 42 (2d Cir. 2017) (affirming dismissal of sex discrimination claims where plaintiff alleged he was falsely accused by a female co-worker of sexual harassment and that she was treated more favorably "because she was a much younger Hispanic woman)).

Put differently, Cheatham does not identify any evidence that provides any "inference that the conduct of the investigation or its outcome was motivated by the fact that he is male." *Id.* at *9.  Though Cheatham contests "the quality of [FEMA's] investigation into the events that ultimately led to [his] termination, the fact that the investigation may not have been as thorough as [he] would have liked does not establish pretext."  *Moses v. Correct Care of South Carolina*, No. 8-2358-JFA-SVH, 2020 WL 4678502 at *6 (D.S.C. Apr. 14, 2020) (granting summary

judgment on behalf of employer for sex discrimination claims where there was no evidence that termination was motivated by discriminatory animus toward men) (quoting *Nnadozie v. ManorCare Health Servs*., LLC, 792 F. App'x 260, 262 (4th Cir. 2019) and citing *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011)), *report and recommendation adopted*, No. 3:18-cv-2358-JFA-SVH, 2020 WL 2899157 (D.S.C. June 3, 2020). Therefore, Defendants' Motion for Summary Judgment shall be granted as to the Title VII discriminatory discharge claim.

## II.    Retaliation

Cheatham alleges several discrete incidents of alleged retaliation. First, while the amended complaint does not raise a claim for retaliatory discharge, in his opposition, Cheatham insinuates that he was terminated from his position as a result of his "EEO activity." *See* Opp'n at 4 (¶ 1). As noted, to establish retaliation, Cheatham must show that his protected activity is causally connected to a materially adverse employment action. *Forkkio*, 306 F.3d at 1131. A causal connection can be established by showing that "the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity. *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006)).

Cheatham began complaining about Walker to Hill internally in June 2012, *see* Pl's Ex. 4, ECF No. 34-4, at 141–43; Defs.' Ex. 1 at 105–08, 213–15, and then filed the Complaint Against Walker on June 13, 2012, *see* Defs.' Stmt. ¶ 5 (citing Defs.' Ex. 1 at 97); Defs.' Ex. 3 at 7 (quoting ROI 101); Pl.'s Stmt. ¶ 21, which he later withdrew on June 28, 2012, *see* Defs.' Stmt. ¶ 6 (citing Defs.' Ex. 1 at 134). He then sought to reopen the claims against Walker, by and through Hill and Merriwether, in late July and August 2012. *See* Defs.' Ex. 1 at 122–3. He was terminated on September 6, 2012. *Id*. at 73; *see also* Defs.' Ex. 2 at 5. Certainly, termination from a job is an adverse employment action. *See Douglas v. Donovan*, 559 F.3d 549, 552–53 (D.C. Cir. 2009).

However, it is not entirely clear here which specific "EEO activity" Cheatham contends triggered his termination from employment. The Court assumes, for Cheatham's benefit, that he is relying on all of these noted complaints.

In retaliation cases, "the adverse action concept has a broader meaning" than in discrimination cases. *Baird v. Gotbaum*, 662 F.3d 1246, 1249 (D.C. Cir. 2011) (internal quotation marks omitted). "[A]ctions giving rise to [retaliation] claims are 'not limited to discriminatory actions that affect the terms and conditions of employment,' but reach any harm that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)). Opposing an unlawful employment practice qualifies as protected activity, even when the opposition is informal, i.e., occurs outside of the EEO administrative process. *See Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).

Regardless upon which protected activity Cheatham relies, the temporal proximity between these complaints and Cheatham's removal was "very close." *Davis v. Gables Residential/H.G. Smithy*, 525 F. Supp. 2d 87, 101 (D.D.C. 2007) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (collecting cases where three- and four-month periods were insufficient)). However, even though Cheatham may raise an inference of causation due to temporal proximity, he must still show that FEMA's proffered justification is pretext for retaliation. *Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 46 (D.D.C. 2014) (citing *Brady*, 520 F.3d at 494) (other citations omitted). And as with the discriminatory discharge claim, the critical question as to retaliation is whether Cheatham has produced sufficient evidence to show that FEMA's non-retaliatory reason was not the actual reason for its actions and that the agency intentionally retaliated against him on a prohibited basis. *See id* at 47–8 (awarding summary judgment to defendants as to discrimination

and retaliatory termination claim where the same proffered evidence was insufficient to show pretext for any unlawful behavior) (citing *Brady*, 520 F.3d at 494).

Cheatham relies on the same evidence presented as to discriminatory discharge to prove his retaliation claim relating to his termination. For the same reasons already discussed however, Cheatham's evidence fails to show that the Defendants' reasons for termination were pretext for unlawful retaliation. He has offered no evidence, aside from his own self-serving and uncorroborated testimony, that the results of the investigation against him, which occasioned his termination, were fabricated to retaliate against him for filing complaints against Walker. To the contrary, *none* of the witnesses in either Brannigan's investigation or the formal EEO investigation testified in support of any of Cheatham's allegations surrounding Walker. And Cheatham has also failed to adduce any competent evidence from which a reasonable jury could conclude that FEMA's investigation irregularities, if any, rose to a retaliatory level. *Clark v. Johnson*, 206 F. Supp. 3d 645, 661 (D.D.C. 2016) (finding that any alleged procedural irregularities in internal FEMA investigation regarding employee were not sufficiently harmful to dissuade a reasonable employee from making or supporting a charge of discrimination) (citing *Velikonja v. Gonzales*, 466 F.3d 122, 124 (D.C. Cir. 2006)).

In sum, any retaliatory discharge claim "is duplicative" of Cheatham's discriminatory discharge claim "and suffers from the same deficiencies; namely, []he has provided no evidence calling into question [FEMA's] stated reason for h[is] termination that would permit a reasonable jury to conclude that" Defendants' "reasons were not its true reasons for its allegedly retaliatory actions." *Young v. Covington & Burling LLP*, 846 F. Supp. 2d 141, 169–70 (D.D.C. 2012). Accordingly, summary judgment is appropriate to the extent that Cheatham raises a retaliatory discharge claim.

Second, Cheatham argues that FEMA's theft investigation into the unreturned laptop computer was also retaliation for the aforementioned protected activity.[7]  Am. Compl. ¶¶ 23, 38. The investigation, initiated by Cason on September 25, 2012,  Def.'s Ex. 3 at 11 (citing AJ Ex. 4 at 11, 178), was conducted internally by the agency and closed in Cheatham's favor on November 16, 2012, upon Cheatham's return of the laptop, Defs.' Stmt. ¶ 16 (citing Defs.' Ex. 3 at 11). Cheatham argues that this investigation constituted a retaliatory conspiracy to hinder his future job prospects, *see* Opp'n at 6–8, 14–15, 24–5, but there is nothing in the record to suggest that any potential new employers were made aware of the investigation. And the record does not demonstrate that the personnel overseeing the open position at FEMA were personally aware of it. Nor is there any indication that *any* of the positions Cheatham unsuccessfully applied for were denied based on same.  Most importantly, Cheatham was non-selected for the first time on January 24, 2013, two months *after* FEMA's investigation had already concluded in his favor.  *See* Defs. Ex. 1 at 250.

Nothing indicates that FEMA was outside of agency policy in (1) investigating the retention of the laptop as theft, or (2) making attempts to recover government property still in Cheatham's possession after his termination. The preponderance of the evidence of record supports FEMA's proposed reasons for seeking the return of its property in the manner conducted.  There is no evidence of a relationship between the laptop investigation and Cheatham's prior EEO activity, and Cheatham was equally unable to suggest any such connection in his own EEO filings. *See* Defs.' Ex. 1 at 322.   Consequently, summary judgment is proper as to this retaliation claim.

---

[7]    The laptop investigation could not have been taken in response to Cheatham's First EEO Complaint.  The laptop investigation was initiated on September 25, 2012, *see* Def.'s Ex. 3 at 11 (citing AJ Ex. 4 at 11, 178), and was closed in Cheatham's favor upon return of the laptop on November 16, 2012, Defs.' Stmt. ¶ 16 (citing Defs.' Ex. 3 at 11).  Cheatham's First EEO Complaint was not filed until November 16, 2012.  *See* Compl. ¶ 27; Defs.' Ex. 1 at 45.

Third, Cheatham maintains that FEMA's retaliation prohibited him from achieving other gainful employment with FEMA, the Navy, and the DCAA, based on their responses to reference requests. Am. Compl. ¶¶ 24–6.  Notably, these requests for references were handled by Stevens, and not any of the individuals involved in his investigation or termination from FEMA.  *See* Defs.' Ex. 3 at 12 (citing AJ Ex. 5 at 514).

Cheatham's first non-selection occurred on January 24, 2013, when Cheatham was notified of his ineligibility for the FEMA position. *See* Defs. Ex. 1 at 250.  This denial occurred approximately five months after Cheatham's attempts to internally renew the Complaint Against Walker. *See* Defs.' Ex. 1 at 122–23.  Although "neither the Supreme Court nor the [D.C. Circuit] has established a bright-line three-month rule," *Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012), the District of Columbia Circuit has generally found that a two- or three-month gap between the protected activity and the adverse employment action does not establish the temporal proximity necessary for causation, *Jones v. District of Columbia Water and Sewer Authority*, 922 F. Supp. 2d 37, 42 (D.D.C. 2013) (collecting cases).  But Cheatham's First EEO Complaint was filed on November 16, 2012, only two months prior to the non-selection for FEMA position GS-0510-13/14.  *See* Compl. ¶ 27; *see* Defs.' Ex. 1 at 45.

This temporal proximity as to the latter is, however, ultimately of little consequence. The FEMA position was open only to "Current FEMA Status Candidates," in other words, current qualified FEMA employees.  *See* Defs.' Ex. 1 at 241, 250.  Cheatham had been fired three months before the position had even been announced.  *See id.* at 241.  Thus, he was notified that he was "outside of the area of consideration as defined under 'Who May Be Considered.' " *Id*. at 250. Title VII retaliation claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013).

Here, FEMA's documented reasons for denying Cheatham employment establish no such connection, and Cheatham offers no evidence to the contrary aside from his own personal belief.

Next, it is undisputed that Cheatham received a tentative offer from the United States Marine Corps, *vis-à-vis*, the Navy.  Defs.' Ex. 3 at 11 (citing ROI 266); Am. Compl. ¶ 25; Opp'n at 4–5 (¶ 3).  During the consideration process, Navy advised Cheatham that "[f]irm or final offers are not made until verification of employment documents and completion of all pre-appointment requirements," which included "receiving and reviewing employment information to confirm eligibility and fitness for an appointment[.]"  Defs.' Ex. 1 at 263.  Navy rescinded its tentative offer to Cheatham on April 30, 2013, approximately six months after Cheatham filed the First EEO Complaint, but only approximately one and a half months after filing the Second EEO Complaint. *See* Defs. Stmt. ¶¶ 20–1 (citing Defs.' Ex. 1 at 82).

Even with this temporal proximity to the Second EEO Complaint, and noting the ongoing nature of the EEO proceedings, the record still reflects the Navy's clear and undisputed reasons for its rescission of employment.  Navy declined to fulfill the tentative offer because Cheatham had admittedly reported to Navy that his FEMA terminated him based on a RIF, when in fact, a subsequent reference check revealed that he had been terminated for, among other reasons, "inappropriate conduct towards others."  Defs.' Ex. 1 at 263.  Navy specifically informed Cheatham that this misrepresentation regarding his termination mandated the offer rescission, as did the actual bases for his termination.  *See id*.  While the Court recognizes that Cheatham fundamentally disagrees with FEMA's reasons for his termination, it is unquestionable that Cheatham was not forthcoming with Navy about the reasons for his removal.

Finally, DCAA declined to hire Cheatham for four different auditor positions. *See* Am. Compl. ¶ 24; Def.'s Ex. 1 at 278–79.  DCAA notified Cheatham in May 2013 that he was not

40

chosen due to the nature and recency of his separation from his position with FEMA. *See id*. Cheatham has again failed, however, to rebut FEMA's valid, nondiscriminatory reasons for his termination, which also served as the basis for non-selection by DCAA. It is unclear if DCAA actually received this information in response to a reference request to FEMA, or merely from Cheatham's own submissions to DCCA, which included copies of his OF-306 and his SF-50, which listed the reasons for his termination. *See id*. at 288–89. Notwithstanding, there is nothing to support Cheatham's speculation that the information supplied to DCCA regarding his FEMA termination was "false, inaccurate, and unsupported information." Am. Compl. ¶ 44. The Court has already found that FEMA's internal investigation, resulting in Cheatham's termination, was sufficient to warrant its findings, therefore, the submission of this information to DCAA upon request cannot be, standing alone, retaliatory.

Additionally, while adverse references by a former employer to a prospective employer can constitute an illegal employment practice, even if such reference "is sent maliciously and productive of a devastating impact[,]" Cheatham must still produce evidence of "disparate treatment based on . . . sex [or gender]." *Shehadeh v. Chesapeake and Potomac Telephone Co. of Maryland*, 595 F.2d 711, 723 (D.C. Cir. 1978); *Passer v. American Chemical Soc*., 935 F.2d 322, 331 (D.C. Cir. 1991). There is absolutely no evidence presented that FEMA's responses to these references were motivated by animus toward Cheatham's sex or gender, and no counterexamples of comparators in similar circumstances are cited.

Consequently, Cheatham has not carried his burden of persuasion as to his any of his claims for retaliation. He has failed to produce probative evidence to rebut FEMA's legitimate nondiscriminatory reasons for his termination, and in turn, the submission of that information to potential employers upon request. Therefore, summary judgment is appropriate as to the

remaining retaliation claims.

## V.      CONCLUSION

For all of the foregoing reasons, the Court GRANTS Defendants' Motion to Dismiss and/or for Summary Judgment.  More specifically, the Court dismisses without prejudice Counts II, III, IV, and V, pursuant to the Federal Rule 12(b)(1).  The Court also dismisses all of the "Doe Defendants."  Defendants' Motion for Summary Judgment is GRANTED as to any due process claims, and also as to Count I and any other claims for sex and gender discrimination and retaliation arising from violations of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-16, and as such, the due process and Title VII claims are dismissed with prejudice. A separate Order will issue contemporaneously.

_____/s/_____
COLLEEN KOLLAR-KOTELLY

Date:   September 13, 2021                    United States District Judge